## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## BALTIMORE DIVISION

|  |  |  |
|---|---|---|
| **PATRICK MYLES**<br>**2930A Long Loop Drive**<br>**Fort Meade, MD 20755**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**THE JOHNS HOPKINS UNIVERSITY**<br>**APPLIED PHYSICS LABORATORY**<br>**11100 Johns Hopkins Road**<br>**Laurel, MD 20723**<br><br>**Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Case No. _____18-3180_____** |

## COMPLAINT AND JURY DEMAND

### Preliminary Statement and Introduction

1.     This is a civil action against the Johns Hopkins University Applied Physics Laboratory ("APL" or "the Lab") for monetary relief for injuries Plaintiff Patrick Myles sustained as a result of the race discrimination, age discrimination, and retaliation to which he was subjected while employed at APL, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a) ("Title VII"), Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981(a), (b) ("Section 1981"), and the Age Discrimination in Employment Act, 29 U.S.C. § 623(a)(1) ("ADEA").

2.     Mr. Myles is an African American and is currently 50 years old.  He is an accomplished professional in computer-based telecommunication systems, with over three decades of experience in the field.  In November 2006, after retiring from twenty years of active

1

duty in the U.S. Navy, Mr. Myles accepted a position as a Telecommunications System Technician at APL. For nearly eleven years, Mr. Myles performed his job duties exceptionally.

3.      In or around July 2014, Mr. Myles applied for a supervisory position at APL, as the Communications Center and Communications Security ("COMSEC") Section Supervisor. Mr. Myles had twenty-eight years of relevant professional work experience in Department of Defense ("DoD") Telecommunications and COMSEC at the time. However, APL rejected Mr. Myles in favor of a white candidate who started as a security guard, Richard Terry. As Section Supervisor, Mr. Terry served as Mr. Myles' direct supervisor, despite having less overall experience in the fields of DoD Telecommunications & COMSEC, and fewer relevant qualifications than Mr. Myles.

4.      In October 2014, in response to the Lab's failure to promote him, Mr. Myles filed an internal complaint alleging race discrimination with the APL Equal Employment Opportunity Office. On June 1, 2015, Human Resources hosted a meeting with Mr. Myles' second-line supervisor and Group Supervisor Michael Connelly, Assistant Group Supervisor Linda Mallory, Human Resources Job Analyst Wanda Adams and Mr. Myles to discuss Mr. Myles' complaint. Mr. Connelly, clearly angered that Mr. Myles had prompted this discussion, told Mr. Myles during this meeting that he was "not a team player."

5.      On September 17, 2015, Mr. Myles applied again for the Communications Center & COMSEC Section Supervisor position, following Mr. Terry's retirement. Mr. Myles had been performing all operational commitments of this position since his hiring in November 2006, and was well qualified for the position. Despite Mr. Myles' twenty-nine years of experience directly in DoD Telecommunications and COMSEC, his previous management experience, and impeccable performance record, APL selected Bradley Stickles, who is white and was 34 years

old when he was selected.  Mr. Stickles had minimal experience and qualifications compared to Mr. Myles.

## Jurisdiction and Venue

6.      This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), as this matter contains a federal question.

7.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a)(1) and (b)(2), as a substantial number of the events, acts, or omissions giving rise to Mr. Myles' claims occurred in Maryland.

8.      All conditions precedent to the institution of this lawsuit have been fulfilled.

## Parties

9.      Plaintiff Patrick Myles is an adult resident of the State of Maryland.  He was employed by APL from November 2006 to August 3, 2017.  At all times relevant to this matter, Plaintiff was an employee of APL.

10.     Defendant APL is a not-for-profit, university-affiliated research center that serves as a technical resource for government agencies, with its campus located in Laurel, Maryland. APL has over 6,000 employees and is engaged in interstate commerce.

## Factual Background

11.     Mr. Myles was hired by APL in November 2006 as a Telecommunications System Technician, responsible for overseeing the operations of DoD computer-based Telecommunication systems, tactical data circuits, and classified messaging systems.  Before he joined APL, he had twenty years of directly relevant experience in DoD Telecommunications with the U.S. Navy, where Mr. Myles supervised and trained DoD Telecommunications

specialists, and served as a subject matter expert on many of the same DoD messaging systems and data circuits for which he was responsible at APL.

12.     From November 2006 to October 2013, Mr. Myles was assigned to APL's Information Technology Services Department ("ITSD").    From October 2013 until his termination, Mr. Myles was assigned to the Security Services Department's Information Systems Security Group ("ZIS").    Throughout Mr. Myles' tenure at APL, he made significant contributions to both departments, and to the Lab at large.

**ZIS Management's Discriminatory Treatment toward Mr. Myles**

13.     From 2006 onward, Mr. Myles received positive evaluations – either "Fully Meets Performance Expectations" or "Exceeds Performance Expectations" – under four different managers:  ITSD Group Supervisor Tom Southall, ZIS Group Supervisor Michael Connelly, Communications Center and COMSEC Section Supervisor Richard Terry, and Communications Center and COMSEC Section Supervisor Bradley Stickles.  From the outset, Mr. Terry and Mr. Southall acknowledged that Mr. Myles "play[ed] a vital role in establishing and implementing [document management] systems," was "highly motivated," and "exceptionally talented."  "Mr. Terry wrote in Mr. Myles' 2012 evaluation that Mr. Myles "mastered the skills necessary to maintain the highest standards of excellence."

14.     From the beginning of his employment, Mr. Myles performed professional-level work for APL.  From 2006 to 2015, Mr. Terry served as Mr. Myles' supervisor and assigned the majority of his own professional-level operational commitments to Mr. Myles.  For instance, Mr. Terry was required to lead and support a classified Video-Teleconferencing ("VTC") service through the SIPRNET network, which included resolving technical issues and ensuring appropriate staffing levels.  Mr. Myles had taken over several of these responsibilities, including

working on the VTC operating procedures, brainstorming solutions to technical issues, and enhancing the overall service.

15.    As another example, one of Mr. Myles' primary duties from 2008 to 2010 was to serve as Network & System Administrator, which required him to build client computers and apply security lockdown procedures, as well as manage users via Microsoft Exchange Server's Active Directory.  On March 19, 2010, in recognition that Mr. Myles had been serving in a supervisory role over three other employees on his team, Mr. Southall, his ITSD group supervisor, classified him as a Working Leader, a designation that increased his salary.

16.    During the time Mr. Myles worked under Mr. Terry's supervision, Mr. Myles also built one hundred percent of the Communications Center's U.S. Navy computing systems on his own, conducted regular security audits, performed patch management, installed security updates, performed vulnerability assessments, drafted operating procedures and contingency plans, led projects for DoD initiatives, and trained telecommunications personnel, all of which required the problem-solving and analytical ability of professional-level work.

17.    In October 2013, APL restructured its departments and established the Security Services Department ("SECD"), which absorbed the Communications Center and COMSEC responsibilities from ITSD.  Richard Weaver, who is white, became the head of SECD.  SECD Department housed five groups, one of which was ZIS.  Michael Connelly, who is also white, was appointed Group Supervisor for ZIS.

18.    As part of the restructuring, APL updated its Technical Support Staff classification structure.  Under the previous classification system, Mr. Myles had been classified by his job title, Telecommunication Systems Technician, and APL had assigned each job title a salary range.  Under this system, employees only changed classifications and salary ranges when

they were promoted to a new title. APL contended that the new system focused on job duties, rather than titles. The new system utilized a Job Classification Matrix through which staff members move once they have demonstrated proficiency in performing each level's work. APL's job classification divides employees into "Support Staff" and "Professional Staff." Within these two classifications, APL employs sub-classifications, based on the employee's department and duties. An employee's classification determines his rate of pay and the APL requirements for professional staff designation align with the Fair Labor Standards Act requirements for classification of overtime exempt employees.

19.     To update employee classifications, APL asked Group Supervisors to reevaluate their staff members, as appropriate, to see if any employees should be reclassified, under the new structure. Mr. Connelly recommended analyses by Human Resources ("HR") for two white COMSEC Custodians under the age of forty, Steve Koresko and Richard Dixon. As a result, Mr. Koresko and Mr. Dixon were both promoted from the Support Staff classification to Professional Staff. Both Custodians had less experience in the associated fields of DOD Telecommunications or COMSEC than Mr. Myles.

20.     Given the similarity between Mr. Myles' level of responsibility and that of Mr. Koresko and Mr. Dixon, he requested that Mr. Connelly also review his classification status. APL considered Mr. Koresko and Mr. Dixon COMSEC subject matter experts, as was Mr. Myles, who had twenty-seven years of experience in both COMSEC and DoD Telecommunications. COMSEC is responsible for the prevention of unauthorized access to information derived from U.S. Government Telecommunications concerning national security, and ensuring the authenticity of such telecommunications.

21.     In fact, APL had requested that Mr. Myles interview new hires to the COMSEC account, including Mr. Dixon in November 2012, because Mr. Myles was one of a few employees with the COMSEC knowledge required to properly gauge the candidates' expertise in the area.  Mr. Myles served as the external and internal point of contact for DoD messaging in the Communications Center, which required him to supervise technical support employees and analyze technical performance issues.  He also served as a liaison to the DoD and U.S. Navy for telecommunications, similar to Mr. Koresko and Mr. Dixon's liaison duties for COMSEC.

22.     Mr. Myles believed these duties most closely aligned with the Professional Staff designation, especially given that APL had acknowledged when it granted him his Working Leader designation that he had been supervising employees and performing high-level duties and that Mr. Myles was performing the operational duties of Mr. Terry, who was designated a Senior Professional I.  Mr. Connelly refused to request a classification analysis for Mr. Myles, responding that he did not believe that Mr. Myles had been "performing professional level work."

23.     In June 2014, Richard Weaver, the head of the SECD, notified Mr. Myles that his new classification was Technical Support Staff III (out of four support staff levels).  Under this new system, the Support Staff III designation essentially equated Mr. Myles' work to that of help desk personnel, which was not a fair assessment of the level of complexity of the duties he actually performed.  However, this was the highest classification in which ZIS could place Mr. Myles without having HR conduct a job analysis.  Rather than ensure through HR that ZIS was properly classifying Mr. Myles under this new system as it had done with Mr. Koresko and Mr. Dixon, it instead chose to place Mr. Myles within the classification that allowed ZIS to circumvent analysis by anyone outside the department.  In December 2013, Mr. Myles had

received a pay raise to $30.08 per hour. When Mr. Myles received the notice of his classification in June 2014, APL kept his salary at the same rate.

24.     After APL had appointed Mr. Weaver and Mr. Connelly to the lead positions within SECD, it opened the remaining supervisory positions and allowed employees either to re-compete for their old posting or apply for a promotion or different position. In July 2014, Mr. Myles sought the Communications Center and COMSEC Section Supervisor position. The Section Supervisor reported directly to the Group Supervisor. Thirteen candidates applied for the Section Supervisor position, and Mr. Myles was one of three applicants selected for an interview. Despite Mr. Myles' twenty-eight years of relevant professional work experience in DoD Telecommunications and COMSEC at this time, Mr. Connelly hired Mr. Terry, a white male. While Mr. Terry had held a supervisory role in ITSD, he had less overall experience in the related fields of DoD telecommunications and COMSEC than Mr. Myles, and had, in fact, started at APL as a security guard before he was hired by the Telecommunications Center.

**APL Discriminatorily Denied Mr. Myles a Promotion within ZIS**

25.     After APL passed him over for the supervisor position, Mr. Myles resumed his Telecommunication Systems Technician position, and Mr. Terry served as his supervisor. Mr. Terry was impressed by Mr. Myles' qualifications. On May 30, 2014, while serving as interim supervisor, Mr. Terry attempted to advocate for Mr. Myles to Linda Mallory, the Assistant Group Supervisor. He told Ms. Mallory that Mr. Myles should be an Associate Professional Staff I by mid-2015 and, after his retirement from APL, he "would really support Patrick becoming the Section Supervisor."

26.     In July 2014, shortly after Mr. Myles learned that he was being classified as Technical Support III, Mr. Terry contacted Ms. Mallory again and emphasized that Mr. Myles'

classification did not appropriately match his contributions to APL.  On July 7, 2014, he stated in an email, "Patrick already meets all the requirements [for Technical Support IV].  He should have been placed as an IV when we made the transition.  Is there anything we can do to get him to IV?"  Ms. Mallory said that she would discuss the matter with HR, but ZIS management failed to take any action to review or upgrade Mr. Myles' classification.

27.     Meanwhile, Mr. Terry continued to lean on Mr. Myles to fulfill the technical and operational roles of Mr. Terry's position, including supporting the classified VTC service through the SIPRNET network and serving as System Administrator, along with other supervisory duties over technical staff.

28.     In August 2014, APL's Facility Security Officer Robert Burch appointed Mr. Myles as secondary COMSEC Alternate Manager to provide support to the COMSEC mission.  Mr. Myles had twenty years of naval experience in COMSEC management and was a prime candidate for a COMSEC position but this additional duty did not replace any of his other ZIS tasks, so he was simply given additional professional tasks without an increase in pay, or reclassification.

29.     In September 2014, Mr. Connelly asked Mr. Myles to assume the position of Assistant Communications Center and COMSEC Section Supervisor without an increase in pay, or reclassification.  Mr. Connelly and Ms. Mallory told Mr. Myles that they wanted him to support Mr. Terry and assume some supervisory responsibilities over other team members.  At this point Mr. Myles had already been performing those duties for Mr. Terry since Mr. Myles had started with APL because Mr. Terry had delegated those responsibilities to him.  Mr. Connelly and Ms. Mallory emphasized that Mr. Myles would be taking on greater leadership responsibilities that would allow him to demonstrate his leadership skills.

30.    When Mr. Myles learned that the position did not entail a reclassification or pay increase, he became concerned that this was another attempt by APL to use his skills and abilities without giving him proper credit for the work he was doing.  Mr. Myles rejected the position in a letter to Mr. Connelly and Ms. Mallory, outlining his disheartenment.  Mr. Connelly simply responded, "We respect your decision on this."

31.    In October 2014, Mr. Myles' dissatisfaction with his position in the Lab caused him to approach the APL Equal Employment Opportunity ("EEO") Office to file a race discrimination complaint against ZIS for its failure to promote him and for pay discrimination. Mr. Myles argued that he had performed roles and responsibilities of a supervisor without commensurate pay, and noted that all managers and supervisors in COMSEC and the Communications Center were white.  Despite Mr. Myles' outstanding performance for the preceding eight years, he noted that he had never been recommended for promotion or reclassification beyond the Support Staff level.

32.    Mr. Myles' complaint triggered the EEO Office to contact HR to conduct, what would turn out to be, the first of two Job Analysis to determine if Mr. Myles should be reclassified, which was the step Ms. Mallory had promised she would take several months earlier.  In December 2014, Wanda Adams, an HR Job Analyst, conducted the analysis but did not seek input from Mr. Myles - Mr. Myles was unaware that HR was conducting a job analysis on him.  Instead, Ms. Adams relied for the most part on attestations from Ms. Mallory, who was unfamiliar with Mr. Myles' daily duties.  This violated the Lab's job reclassification procedures, which require that the Group Supervisor work with the job analyst to determine the appropriate classification - Group Supervisor, Michael Connelly chose not to participate in the HR Job Analysis process conducted on Mr. Myles.  Based on this incomplete information, Ms. Adams

ultimately determined that Mr. Myles was not performing professional-level work but did believe that he was misclassified and recommended to Mr. Connelly that he upgrade Mr. Myles to Technical Support IV.

33.     Mr. Myles was notified on December 23, 2014, that the EEO Office failed to substantiate his discrimination charge.  Shortly thereafter, Mr. Connelly notified Mr. Myles that APL had changed his classification to Technical Support IV, and would backdate his pay increase from $30.08 to $31.06 per hour to June 25, 2014, when Mr. Connelly erroneously decided to classify Mr. Myles as Technical Support III.  He then additionally raised Mr. Myles' pay to $32.06 per hour, effective December 29, 2014, which was the time of year when APL traditionally provided annual increases.

34.     In January 2015, Mr. Myles appealed the EEO's findings to the APL Compliance Office, which affirmed the EEO's findings.  On February 6, 2015, at Mr. Myles' request, HR held a meeting with Mr. Myles, Mr. Connelly, Ms. Mallory, Mr. Terry, and HR's Jessica Wilt to discuss the issues Mr. Myles had raised in his complaint.  During the meeting, Mr. Terry acknowledged that Mr. Myles had supervised and managed Communications Center projects. This acknowledgment did not result in a further classification change.

35.     Mr. Myles was not given the opportunity until March 2015 to review the job analysis Ms. Adams had conducted to support this classification change.  When Mr. Myles saw Ms. Adams' analysis, he observed that the analysis was riddled with inaccuracies.  For instance, while Ms. Adams acknowledged that Mr. Myles engaged in some professional level work by serving as a project lead, she contended that he did not serve in this capacity on an ongoing basis. In fact, Mr. Myles regularly served as a project lead and informed Ms. Adams that he estimated that this duty represented seventy-five percent of his work, thus was his primary duty on an

ongoing basis.  Mr. Myles also sent Ms. Adams a detailed letter describing his professional level work, including his Network & Systems Administrator duties, his role building and managing Navy computing systems, and his supervisory role over technicians.  For several months, Mr. Myles communicated with Ms. Adams and other HR representatives about the matter and provided them with extensive documentation to support his contention that he was performing professional-level work.

36.     Mr. Myles' efforts culminated in a June 1, 2015, meeting with Ms. Adams, Mr. Connelly, and Ms. Mallory, to discuss the issue.  Mr. Myles explained that Mr. Terry had given Mr. Myles supervisory and professional level responsibilities but Mr. Terry failed to explain Mr. Myles' role to other members of their team and APL failed to give him a title or classification commensurate with this work, which undercut his effectiveness.  Mr. Connelly was angered by Mr. Myles' complaint and told Mr. Myles he was "not a team player."

37.     Mr. Terry, who had worked for APL for twenty years, decided to retire on August 5, 2015.  Prior to doing so, Mr. Terry sent an APL-wide email lambasting ZIS management for its ineptitude.  In his email, Mr. Terry stated that APL was doing well prior to the restructuring, at which point new management came "along and screw[ed] things up."  After his abrupt departure, APL appointed Ms. Mallory interim Section Supervisor and began the search for a replacement.

38.     On September 17, 2015, Mr. Myles applied for the Communications Center and COMSEC supervisor position for the second time.  Twelve candidates applied for the position, and Mr. Myles was again one of three applicants selected for an interview.  For the second time, Mr. Connelly did not select Mr. Myles for the position.  Instead, he selected Bradley Stickles, a former APL employee who had left the Lab after two and a half years.  Mr. Stickles is white and

was thirty-four years old when he was selected.  He had minimal experience and qualifications compared to Mr. Myles.

39.    For instance, Mr. Myles had obtained a professional security certification (COMPTIA Security+) in April 2014, even though it was not required for his job, to improve his prospects for a promotion.  Mr. Stickles did not have this or any other relevant professional security certification, even though the supervisor position required a Professional Security certification. However, APL hired Mr. Stickles without this certification, and other required qualifications: no security clearance; no prior experience with DoD messaging systems or SIPRNET classified VTC operations (Stickles never worked for the DOD).

40.    In the APL EEO Office's July 10, 2017, findings and in APL's Position Statement to the EEOC, APL contended that Mr. Stickles met this requirement by holding a National Security Agency ("NSA") COMSEC certification (IAEC-2112).  Not only is this not a professional certification, it is not a certification at all, but a mandatory training course required by the NSA to be added to its COMSEC account.  Mr. Myles is aware of this because he also completed this mandatory training course.

41.    On November 25, 2015, Mr. Myles filed a second EEO complaint for race and age discrimination and retaliation against ZIS management for this second failure to promote him to the Communications and COMSEC Section Supervisor position.  Mr. Myles noted that, given his twenty-nine years of experience directly within the fields, Mr. Connelly's failure to hire him coupled with his clear preference for demonstrably less qualified white candidates demonstrated his discriminatory animus.  Mr. Connelly decided to hire an employee who was only thirty-four years old, with several years of general work experience, and two and a half years of prior employment at APL, while Mr. Myles, by comparison, had twenty-nine years of

direct experience in DoD Telecommunications and COMSEC when he applied for the position – experience he acquired during his twenty-year military career with the Department of Defense, coupled with his nine years of performing supervisory work at APL.

42.     Furthermore, Mr. Myles believed that his complaints related to his classification and the prior promotion decision caused Mr. Connelly to retaliate against him by selecting another younger, white applicant with fewer qualifications and less relevant experience, who had never complained about discrimination at APL.

43.     Again, the EEO Office did not find discrimination or retaliation, citing to what it calls the "matrix" that ZIS created to determine which candidate to hire, arguing that Mr. Myles had been held to objective and fair standards.  However, the EEO Office did not address the fact that this purportedly objective rating system was created by the very person who had reason to retaliate against Mr. Myles.

44.     On January 16, 2018, the EEOC made a determination that "there is reasonable cause to believe [APL] denied [Mr. Myles] the promotion to the section supervisor position because of his race (black) and age (47) and retaliated against him when he engaged in a protected activity; therefore violating Title VII and the ADEA."

45.     As a result of the Lab's actions, Mr. Myles has suffered and will continue to suffer considerable economic, emotional, and professional harm.

## COUNT I

**Violation of Title VII of the Civil Rights Act of 1964,
as amended, 42 U.S.C. Sec. 2000e *et seq.*
Race Discrimination**

46.     Plaintiff hereby incorporates as though restated all of the factual allegations above.

47.    Title VII prohibits discrimination on the basis of race with respect to an employee's compensation, terms, conditions, or privileges of employment.  42 U.S.C. § 2000e-2(a).

48.    Defendants discriminated against Mr. Myles based on his race by failing to promote him to the Section Supervisor position in 2015 under circumstances that give rise to a strong inference of unlawful discrimination.   There are no non-white employees at the management level within ZIS Management - all ZIS Section Supervisors selected by ZIS Group Supervisor, Michael Connelly, are white males.   Mr. Connelly's consistent practice of filling management-level vacancies with less qualified white employees demonstrates that he discriminatorily reserved those positions for white employees only.  Mr. Myles had twenty-nine years of experience in Defense communications systems and nearly nine years with APL when he applied.

49.    Defendants rejected Mr. Myles' application in favor of a less qualified white candidate.  Mr. Stickles had several years of general work experience and two and a half years of prior employment at APL, while Mr. Myles, by comparison, had twenty-nine years of direct experience in DoD Telecommunications and COMSEC when he applied for the position – experience he acquired during his twenty-year military career with the Department of Defense, coupled with his nine years of performing supervisory work at APL. Mr. Stickles did not have the requisite professional security certification, stated to be an essential qualification for the position, while Mr. Myles had the requisite professional security certification (COMPTIA Security+). Mr. Myles also had a proven track record at APL, with consistently high ratings on his performance reviews for nine years, and his previous supervisor Mr. Terry had told Ms. Mallory that he supported Mr. Myles' selection as Section Supervisor after Mr. Terry retired.

50.     Defendant's actions directly and proximately caused Mr. Myles to suffer and to continue to suffer loss of income and other financial benefits, emotional distress, pain, suffering, stress, humiliation, loss of enjoyment of life, and damage to his reputation and career, and further loss of future professional opportunities.

51.     Defendant engaged in its discriminatory actions described above with malice or with reckless indifference to Plaintiff Myles' legal rights

### COUNT II

**Violation of Title VII of the Civil Rights Act of 1964,
as amended, 42 U.S.C. Sec. 2000e *et seq.*
Retaliation**

52.     Plaintiff hereby incorporates as though restated all of the factual allegations above.

53.     Title VII prohibits retaliation against an employee for, <u>inter alia</u>, complaining of or otherwise opposing discrimination based on race.  42 U.S.C. § 2000e–3(a).

54.     Mr. Myles engaged in protected activity each time he reported APL's discriminatory employment decisions to the EEO Office, and when he persisted in efforts to get APL to reconsider his pay classification despite Mr. Connelly's unwillingness to have his work evaluated.

55.     Defendant retaliated against Mr. Myles for his complaints that he was subjected to discrimination based on race by not selecting him for a supervisory position for which he was well qualified.

56.     Defendant took the actions complained of herein because of Mr. Myles' protected activity.

57.    Defendant's actions directly and proximately caused Mr. Myles to suffer and to continue to suffer loss of income and other financial benefits, emotional distress, pain, suffering, stress, humiliation, loss of enjoyment of life, and damage to his reputation and career, and further loss of future professional opportunities.

58.    Defendant engaged in its discriminatory actions described above with malice or with reckless indifference to Plaintiff Myles' legal rights.

**COUNT III**

**Violation of Title 42 U.S.C. § 1981**
**Race Discrimination**

59.    Plaintiff hereby incorporates as though restated all of the factual allegations above.

60.    Section 1981 prohibits discrimination on the basis of race with respect to an employee's compensation, terms, conditions, or privileges of employment.  42 U.S.C. § 1981.

61.    Defendants discriminated against Mr. Myles based on his race by failing to promote him to the Section Supervisor position under circumstances that give rise to a strong inference of unlawful discrimination.  There are no non-white employees at the management level within ZIS Management - all ZIS Section Supervisors selected by ZIS Group Supervisor, Michael Connelly, are white males. Mr. Connelly's consistent practice of filling management-level vacancies with less qualified white employees demonstrates that he discriminatorily reserved those positions for white employees only.  Mr. Myles had twenty-nine years of experience in Defense communications systems and nearly nine years with APL when he applied.

62.    Defendants rejected Mr. Myles' application in favor of a less qualified white candidate.  Mr. Stickles had several years of general work experience, and two and a half years

of prior employment at APL, while Mr. Myles, by comparison, had twenty-nine years of direct experience in DoD Telecommunications and COMSEC when he applied for the position – experience he acquired during his twenty-year military career with the Department of Defense, coupled with his nine years of performing supervisory work at APL.. Mr. Stickles did not have the requisite professional security certification, stated to be an essential qualification for the position, while Mr. Myles had the requisite professional security certification (COMPTIA Security+). Mr. Myles also had a proven track record at APL, with consistently high ratings on his performance reviews for nine years, and his previous supervisor Mr. Terry had told Ms. Mallory that he supported Mr. Myles' selection as Group Supervisor after Mr. Terry retired.

63. Defendant's actions directly and proximately caused Mr. Myles to suffer and to continue to suffer loss of income and other financial benefits, emotional distress, pain, suffering, stress, humiliation, loss of enjoyment of life, and damage to his reputation and career, and further loss of future professional opportunities.

64. Defendant engaged in its discriminatory actions described above with malice or with reckless indifference to Plaintiff Myles' legal rights.

## **COUNT IV**

### **Violation of Title 42 U.S.C. § 1981**
### **Retaliation**

65. Plaintiff hereby incorporates as though restated all of the factual allegations above.

66. Section 1981 prohibits retaliation against an employee for, inter alia, complaining of or otherwise opposing discrimination based on race. 42 U.S.C. § 1981.

67. Mr. Myles engaged in protected activity each time he reported APL's discriminatory employment decisions to the EEO Office, and when he persisted in efforts to get

APL to reconsider his pay classification despite Mr. Connelly's unwillingness to have his work evaluated.

68.     Defendant retaliated against Mr. Myles for his complaints that he was subjected to discrimination based on race by not selecting him for a supervisory position for which he was well-qualified.

69.     Defendant took the actions complained of herein because of Mr. Myles' protected activity.

70.     Defendant's actions directly and proximately caused Mr. Myles to suffer and to continue to suffer loss of income and other financial benefits, emotional distress, pain, suffering, stress, humiliation, loss of enjoyment of life, and damage to his reputation and career, and further loss of future professional opportunities.

71.     Defendant engaged in its discriminatory actions described above with malice or with reckless indifference to Plaintiff Myles' legal rights.

## COUNT V

**Violation of the Age Discrimination in Employment Act,
29 U.S.C. §§ 623 *et seq.*
Age Discrimination**

72.     Plaintiff hereby incorporates as though restated all of the factual allegations above.

73.     The ADEA prohibits discrimination on the basis of age with respect to an employee's compensation, terms, conditions, or privileges of employment.   29 U.S.C. §§ 623(a)(1), 631(a).

74.     Defendants discriminated against Mr. Myles based on his age by failing to promote him to the Section Supervisor position under circumstances that give rise to a strong

inference of unlawful discrimination.  Mr. Myles was 47 years old when he applied for the Section Supervisor position in 2015.  He performed exceptionally during his tenure at the Lab, as evidenced by the positive feedback he received on numerous occasions regarding his successes and his performance as a whole, and the supervisory and professional responsibilities he was given.  Despite this positive performance, ZIS failed to promote him and instead hired the 34-year old Mr. Stickles, who was not only much younger, but also had far less relevant experience.

75.    Mr. Stickles had several years of general work experience and two and a half years of prior employment at APL, while Mr. Myles, by comparison, had twenty-nine years of direct experience in DoD telecommunications and COMSEC when he applied for the position – experience he acquired during his twenty-year military career with the Department of Defense, coupled with his nine years of performing supervisory work at APL.  Mr. Stickles did not have the requisite professional security certification, stated to be an essential qualification for the position, while Mr. Myles had the requisite professional security certification (COMPTIA Security+).  Mr. Myles also had a proven track record at APL, with consistently high ratings on his performance reviews for nine years, and his previous supervisor Mr. Terry had told Ms. Mallory that he supported Mr. Myles' selection as Group Supervisor after Mr. Terry retired.

76.    Defendant's actions directly and proximately caused Mr. Myles to suffer and to continue to suffer loss of income and other financial benefits, emotional distress, pain, suffering, stress, humiliation, loss of enjoyment of life, and damage to his reputation and career, and further loss of future professional opportunities.

77.    Defendant's actions directly and proximately caused Mr. Myles to suffer and to continue to suffer loss of income and other financial benefits, emotional distress, pain, suffering,

stress, humiliation, loss of enjoyment of life, and damage to his reputation and career, and further loss of future professional opportunities.

78.    Defendant's actions constituted a willful violation of the ADEA.

## REQUESTED RELIEF

79.    WHEREFORE, Plaintiff demands a trial by jury and prays this Court for the following relief:

a)  Enter a judgment in Mr. Myles' favor and against APL for violations of Title VII, Section 1981, and the ADEA;

b)  Award Mr. Myles compensatory damages for the pain and suffering, damage to career, and loss of enjoyment of life, that he has experienced as a result of APL's unlawful conduct in an amount to be determined at trial;

c)  Award Mr. Myles punitive damages in an amount to be determined at trial;

d)  Order Defendant APL to place Mr. Myles in a Communication Center & COMSEC Supervisor Professional position;

e)  Award Mr. Myles reasonable attorneys' fees, litigation expenses, and costs; and

f)  Award Mr. Myles all other relief permitted under the above causes of action or which the Court deems appropriate.

Respectfully submitted,

*/s/ David A. Branch*
David A. Branch, #22862
Law Offices of David A. Branch
        & Associates, PLLC
1828 L Street, NW, Suite 820
Washington, DC  20036
(202) 785-2805
davidbranch@dbranchlaw.com

## JURY DEMAND

Plaintiff requests trial by jury as to all issues in this case.


/s/ David A. Branch
David A. Branch

*Attorney for Plaintiff Patrick Myles*


Dated:  October 12, 2018